Stanislaw IGNATYUK, Libelant,

v.

TRAMP CHARTERING CORP., a foreign corporation and THE ANNITSA, its tackle, apparel, etc., Respondent and Claimant-Appellant,

and

Connecticut Terminal Company, Inc., and Canadian Transport Co., Ltd., Respondents-Impleaded,

and

Connecticut Terminal Company, Inc., Respondent-Impleaded-Appellee.

No. 15, Docket 23761.

United States Court of Appeals Second Circuit.

Argued Oct. 18, 1957.

Decided Dec. 16, 1957.

Frederick H. Cunningham, New York City (Victor S. Cichanowicz, New York City, of counsel), for appellant.

Galli & Locker, New York City (Patrick J. McCann and Patrick E. Gibbons, New York City, of counsel), for appellee.

Before MEDINA, HINCKS and WATERMAN, Circuit Judges.

MEDINA, Circuit Judge.

On October 15, 1953 Stanislaw Ignatyuk, a longshoreman in the employ of Connecticut Terminal Company, Inc., was injured in the course of unloading the SS. Annitsa at the State Pier in New London, Connecticut. Upon the filing of his libel against Tramp Chartering Corp., the owner and operator of the vessel, Tramp impleaded Connecticut Terminal and also the time charterer Canadian Transport Co., Ltd. The final decree awarded damages to Ignatyuk and these damages have been paid. The petition against Canadian Transport was dismissed, and no appeal has been taken from the dismissal. The sole issue before us on this appeal is the correctness of the findings and conclusions supporting so much of the decree as held the steamship company solely liable and dismissed its petition for indemnity against Connecticut Terminal, the stevedore.

The SS. Annitsa was moored starboard side to the pier. She carried a cargo of dressed lumber, stowed on deck

to a height of about nine or ten feet, covering the entire deck space in the vicinity of Number 5 hatch, where the accident occurred. In loading and stowing this cargo of lumber chains had been placed on the deck, running through or fastened to a number of pad-eyes, that were part of the permanent ship's fittings sometimes used for rigging booms. After lumber had been piled upon these chains to a sufficient height, the chains were brought together on top of the lumber and snugged up by the use of turnbuckles. On the port side offshore a certain cleat about eight feet aft of the Number 5 winches was left uncovered in a space measuring about one foot square.

In preparation for the unloading at Number 5 hatch two booms were rigged. The starboard or inshore boom, intended as a Burton, was spotted over the pier on which the drafts of lumber were to be placed. The port or offshore boom, as the up-and-down boom, was spotted so that a plumb line from the top would go down to about the middle of the hatch coaming on the port side. This made it necessary to pull the boom sufficiently to port to permit the unloading operation to proceed. To accomplish this a regular guy was rigged from the top down to the end of the boom and this consisted of a wire cable with a length of manila rope at each end to run through the blocks, and a preventer guy pulling the boom to port and away from the hatch. The only available fitting to which this preventer guy could be attached was the cleat, which was of forged steel with two eight-inch wings running fore and aft.

It was a difficult task to attach the preventer guy to this cleat, but two of the longshoremen accomplished this by hanging over the side of the vessel, holding on to hooks embedded in the lumber; and one of these men wound the preventer cable in a figure eight manner about the wings of the cleat, making the first turn about the aft wing of the cleat. The two rigs were then "married" or joined together and the work of unloading proceeded

Just as one of the drafts of lumber was being hoisted, the forward wing of the cleat gave way and at the same time the rope on the regular guy parted, with the result that the port boom swung toward the hatch and the flying parts of the rig hit Ignatyuk, inflicting serious injuries. Both the regular guy and the cleat were part of the apparatus and rigging of the ship; and the basic findings by the trial judge were that both were defective; that the vessel was unseaworthy and the shipowner negligent in failing to provide a safe place to work; and that the accident was due to the defects in the manila rope and in the cleat.

The claim of indemnity is based upon the agreement of Connecticut Terminal, which we may assume contained a provision, express or implied, that Connecticut Terminal would conduct the unloading operation in an efficient and workmanlike manner. The specific clauses relied upon by appellant are: Section 2, subdivision b, by which the stevedore agreed to:

"Provide all necessary stevedoring labor, including winchmen, hatch tenders, tractor and dock crane operators, also foremen and such other stevedoring supervision as are needed for the proper and efficient conduct of the work."

Also Section 2, subdivision c:

"Adjust rigging of booms and guys, etc., at hatches where work of discharging and/or loading will be conducted and unrigging when completed, also removing and replacing beams and hatch covers."

And Section 6:

"The contractor is to supply all other cargo handling gear and equipment such as hooks, pendants, save-alls, nets, trays, bridle chains and slings (except slings for heavy lifts when hoisted by heavy lift floating or shore derricks) also hand trucks, mechanical trucks or tractors, also dock tractor cranes as needed for efficient stevedoring work."

While Tramp asserts that there was no privity of contract between the shipowner and the stevedore, we may assume the contrary *arguendo,* as we have concluded that there is no liability on the part of the stevedore even if we should sustain the finding by the trial judge, that the time charterer Canadian Transport Co., Ltd., made the contract with the stevedore on behalf of the shipowner and as its agent.

■ A preliminary point need not detain us long. Reference is made to a rule of the Maritime Safety Code, compiled by the Maritime Association of the Port of New York, which recommended the use of deck lashings for securing preventers. Neither of the men who went over the side to adjust the preventer was injured, and this coupled with the fact that the provision relied upon is not mandatory but a mere suggestion—"may be used"—disposes of this preliminary contention.

■ Appellant's principal contention is that the preventer should have been first rigged horizontally through the padeyes rather than directly on the cleat. But the trial judge found that it was reasonable and proper for the longshoremen to rig the preventer in the way it was rigged, because the pad-eyes were completely covered by the cargo. There was ample evidence to support this finding and the testimony of appellant's expert to the contrary was rejected. We find no error here.

It is significant that the equipment was designed to carry a far heavier load than the one with which it was burdened when the accident happened, and the first turn of the cable was around the aft wing of the cleat, but the one that gave way and turned upward was the forward wing. From this the trial judge very properly inferred that the forward wing was not subject to any greater stress because the preventer guy had not first been led through a pad-eye. Moreover, the Maritime Safety Code provides: "Guys, preventers and other lines should each be fastened to a separate cleat or ring bolt," and this was done.

■ The mere circumstance that the trial judge does not in terms state that the stevedore performed its contract to do the work in an efficient and workmanlike manner, seems to us of little importance in view of the findings which ascribe the accident solely to the defects in the guy rope and the cleat, and specifically state that no negligence of Connecticut Terminal was in the line of causation. Consistently with these findings we cannot perceive any breach by the stevedore of its warranty of workmanlike service; and we are at a loss to discover any proof of breach by Connecticut Terminal of any of the other clauses of the contract relied upon by the shipowner. Despite all this appellant earnestly presses a further contention to the effect that, while the stevedore might not have been under a duty to discover some latent defect in the forged steel of the cleat, it was under a duty to reject and refuse to use the regular guy because the trial judge found that the manila rope part of this guy was "black, old and rotten." But Barry the hatch foreman testified that he tried it out and thought it was all right, even though it did look old; and it held up for some little time as the work progressed before the accident. There is no proof whatever in the case to warrant an inference that the rottenness in this rope, which caused it to part under a normal load, could have been detected by a cursory examination. It was certainly not an obvious defect, as was the "rusted and kinky" condition of the cables in Shannon v. United States, 2 Cir., 235 F.2d 457, 458.

The claim of indemnity here stems from the contract. We hold that an implied warranty of workmanlike performance by a stevedore does not place upon him a duty to discover defects in the apparatus or equipment furnished by the vessel being loaded or unloaded which are not obvious upon a cursory inspection. See Seas Shipping Co. v. Sieracki, 328 U.S. 85, 95, 66 S.Ct. 872, 877, 90 L.Ed. 1099; Shannon v. United States, 2 Cir., 235 F.2d 457; Gucciardi v. Chis-

holm, 2 Cir., 145 F.2d 514; Liverani v. John T. Clark & Son, 231 N.Y. 178, 131 N.E. 881. The seaworthiness of the vessel is a quite different matter and so is the duty of the shipowner to provide a safe place to work.

Affirmed.