Salvatore D'AMICO, Plaintiff-Appellee,

v.

LLOYD BRASILEIRO PATRINONIC NATIONALE, Defendant and Third-Party Plaintiff-Appellant,

v.

AMERICAN STEVEDORES, INC., Third-Party Defendant-Appellee.

No. 94, Docket 29870.

United States Court of Appeals Second Circuit.

Argued Oct. 27, 1965.

Decided Dec. 22, 1965.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

Paul C. Matthews, Jr., New York City (Paul C. Matthews, New York City, on the brief), for plaintiff-appellee.

William F. Larkin, New York City (Schaffner & Furey, New York City, on the brief), for defendant and third-party plaintiff-appellant.

John F. X. McKiernan, New York City (George J. Conway, New York City, on the brief), for third-party defendant-appellee.

Before LUMBARD, Chief Judge and MEDINA and SMITH, Circuit Judges.

MEDINA, Circuit Judge:

Salvatore D'Amico, a winchman working aboard the S.S. Loide Canada, was injured on May 16, 1961 when the rope holding a large rain tent parted and the tent fell, pinning D'Amico against the hatch coaming. After a trial to court

and jury, Judge Cooper directed a verdict against Lloyd Brasileiro Patrinonic Nationale, the shipowner, on the issue of unseaworthiness and dismissed the shipowner's cross-claim against D'Amico's employer, American Stevedores, Inc. Only the question of damages was submitted to the jury, which returned a verdict for $7500. The shipowner appeals.

At about 8:30 A.M. on May 16, 1961, the work started at #2 hatch. As it was raining, it was necessary to rig a hatch tent. This was a large, heavy canvas protective device on the outside and at the peak of which was an iron ring. There were the customary up-and-down and Burton winches and equipment. We are concerned in this case only with the up-and-down operation. The crew of the vessel had already rigged the lines through two blocks at the head of the boom, some 40 or 50 feet from the deck of the vessel. One of these lines was a metal cable leading to the up-and-down winch. The other was a ¾″ manila rope used as a gantline to hold up the hatch tent. The two blocks were placed about a foot apart. The evidence is undisputed that the hatch boss and at least one of the other longshoremen employed by American Stevedores, Inc. examined the gantline visually as far up as they could see and they found it in good condition, without any fraying, loose strands or signs of being "chewed up." One of the ends of the gantline was then tied to the ring at the top of the tent by a bowline knot and D'Amico, who was operating the up-and-down winch, raised the tent some distance above the hatch and then lowered it to its proper position as a protection for the men against the rain. The other end of the gantline was then fastened to a cleat on the deck. The undisputed evidence is also to the effect that, after the metal cable was rigged to the up-and-down winch and before handling any cargo, there was a check-up to make sure that neither of the cables leading to the up-and-down and the Burton winches came near the gantline. Thus, despite the rigging of the two blocks about a foot apart at the head of the up-and-down boom, the metal cargo fall and the gantline did not touch one another, even after the angle of the boom had been changed from 45° to 30°.

After the work had progressed without incident for about 45 minutes, during which the longshoremen handled some 30 to 35 drafts of cargo, the gantline parted at a place about 4 feet above the bowline knot in the iron ring and the heavy tent fell, hitting D'Amico on the shoulder and pinning him against the coaming of the hatch. D'Amico was 5 feet 5 inches in height, and the coaming, sometimes described in the testimony as the railing, was 3½ to 4 feet high.

■ From the above recital of the evidence it is difficult to discover any alternative open to the trial judge other than to direct a verdict against the shipowner on the issue of unseaworthiness. D'Amico had already abandoned the claim of negligence and no claim of contributory negligence was or could have been asserted. We are urged to reverse, however, principally because of what we feel compelled to regard as a fictitious and unreal issue said to arise out of a snapshot photograph of a piece of rope that was received in evidence as Exhibit A, and the rejection of certain alleged expert testimony based on this Exhibit.

■ The two pieces of the rope involved in the accident had disappeared. In any event, neither of them was produced at the trial. Nor was the person who took the photograph produced. The most appellant can claim is that one of the witnesses, while unable to identify the rope in the photograph, said it looked something "like" the rope in question. This, in our view, is patently insufficient basis for an expert opinion to the effect, in substance, that the rope was "cut" by the up-and-down fall leading to one of the two blocks at the head of the boom. There is not a shred of evidence in the case to support such speculation.

■ The shipowner also claims it was error for the trial judge to refuse to strike from the jury's consideration the claimed item of damage arising out of

injury to D'Amico's left acromioclavicular joint. In substance, the claim is that D'Amico's expert witness, Dr. Irving Mauer, testified on cross-examination that the injury to D'Amico's acromioclavicular joint could only have resulted from "a direct blow" and that there was no evidence of such a blow. This particular quotation from a prolonged cross-examination seems to us to relate to a series of hypothetical situations brought up by the cross-examiner rather than to the particular injury suffered by D'Amico. In fact, Dr. Mauer's testimony on direct examination was clear that if D'Amico "was caught between a hatch tent which came down across the back of his neck and shoulders and a railing and was pinned against it," injury to the left acromioclavicular joint would occur. Perhaps if D'Amico was standing up straight, the 3½ to 4 foot coaming would only come up to his chest, as counsel for appellant contends. But, when the heavy tent descended upon him, he said, it hit "on top of my shoulder" and his shoulders were pinned against the coaming for some time before he could extricate himself. In any event, there is ample testimony to justify a finding that there was some injury to the acromioclavicular joint of D'Amico's left shoulder. It would have been serious prejudicial error to strike one of the principal items from the sum of the injuries D'Amico claimed to have suffered.

██ Nor is there any basis for the claim over against the stevedore, in the absence of some showing that the stevedore breached its duty of workmanlike performance by using defective equipment after it had notice that the equipment was defective, Weyerhaeuser Steamship Co. v. Nacirema Operating Co., Inc., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491; Beard v. Ellerman Lines, Ltd., 3 Cir., 1961, 289 F.2d 201, 207, rev'd on other grounds sub nom. Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 1962, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798; American President Lines, Ltd. v. Marine Terminals Corp., 9 Cir., 1956, 234 F.2d 753,

cert. denied, 352 U.S. 926, 77 S.Ct. 222, 1 L.Ed.2d 161, or had created or contributed to the creation of the unseaworthy condition that caused the accident. The stevedore is not responsible for latent defects not discoverable by reasonable, if only cursory, inspection. See Ignatyuk v. Tramp Chartering Corp., 2 Cir., 1957, 250 F.2d 198; Cia Maritima Del Nervion v. James J. Flanagan Shipping Corp., 5 Cir., 1962, 308 F.2d 120, 123–125.

Here the gantline and the block through which it was reeved were ship's equipment and had been put in place by the crew of the vessel. There is no proof that the stevedore had reason to think anything was amiss.

Affirmed.