176

James SMITH, Libellant, Appellant and
Cross-Appellee,

v.

JUGOSALVENSKA LINIJSKA PLOVI-
DEA, Respondent, Appellee and
Cross-Appellant,

v.

HAMPTON ROADS STEVEDORING
CORPORATION, Impleaded-
Respondent, Appellee.

No. 8042.

United States Court of Appeals
Fourth Circuit.

Argued March 14, 1960.

Decided April 18, 1960.

Sidney H. Kelsey, Norfolk, Va., for appellant and cross-appellee.

Hugh S. Meredith and Walter B. Martin, Jr., Norfolk, Va. (Vandeventer, Black, Meredith & Martin, Norfolk, Va., on brief), for appellee and cross-appellant.

John W. Winston, Norfolk, Va. (Seawell, McCoy, Winston & Dalton, Norfolk, Va., on brief), for appellee.

Before SOBELOFF, Chief Judge, and HAYNSWORTH and BOREMAN, Circuit Judges.

BOREMAN, Circuit Judge.

James Smith instituted a libel in admiralty in the United States District Court for the Eastern District of Virginia, Norfolk Division, against the motor vessel SRBIJA, a Yugoslavian vessel, and her owner, Jugosalvenska Linijska Plovidea, to recover damages for personal injuries sustained during the performance of his duties as a longshoreman on said vessel. The vessel and her owner, hereinafter called "Vessel", seeking indemnification, impleaded Smith's employer, Hampton Roads Stevedoring Corporation, hereinafter sometimes called "Stevedores", under General Admiralty Rule 56, 28 U.S.C.A. Unseaworthiness of the vessel was established and admitted and the District Court, after finding that the Vessel had no justifiable claim over against Stevedores, concluded that the only issue was the question of damages. A decree was entered awarding Smith $5,750 against the Vessel. This appeal by Smith and cross-appeal by Vessel followed.

Smith, a male negro twenty-eight years of age, married, with four children, worked as a longshoreman during 1957 and 1958. It is generally agreed among the doctors who testified that although Smith worked successfully as a longshoreman during this period, he should not have been so employed because of his health, which is later discussed. On June 20, 1958, he was sent on board the SRBIJA for work in the number 4 hold, access to which was provided by a vertical steel ladder. The top of the ladder was supposedly attached to the hatch coaming and the bottom was secured to the 'tween deck. Three longshoremen, members of his same crew, preceded Smith down the ladder without incident. Smith stepped onto the ladder and while he was descending, it swung away from the hatch coaming to an angle of about 45° with the 'tween deck and Smith was jerked or thrown to the 'tween deck below where he struck his head. The bolts which ordinarily secured the ladder to the coaming were not in place but the evidence fails to disclose who removed them. Unconscious, Smith was taken to the Norfolk General Hospital and when he regained consciousness he was in a raging and maniacal condition.

The evidence indicates that Stevedores' safety man, Robert E. Spellman, preceded the working crew on board and noticed that the ladder in question was not secured by bolts although it was a bolt type ladder. It was his job to inspect ship's equipment before the same is used by longshoremen. He testified that he only looked at the ladder, did not put his hand on it, and without further investigation decided that it was welded in place.

The primary question as to Smith's right of recovery is whether or not he suffered from epilepsy prior to the shipboard accident and, if so, whether the accident aggravated the pre-existing condition. On this appeal Vessel contends that Smith sought to work a fraud on the court by failing to disclose his prior epileptic seizures or personality disorder, by failing to disclose his hospitalization for these conditions and by concealing his first army service in 1946 from which he was given a medical discharge. During the trial the District Judge noted these failures to make disclosures, but concluded that his decision would not be affected thereby if he found aggravation of a pre-existing condition since persons so afflicted are naturally reluctant to disclose such affliction. We accept the court's approach and conclusion with respect to this phase of the case.

■ The District Court considered the testimony of five doctors and had before it records of the several diagnoses made by the army and its medical reviewing boards relative to Smith's condition. From this evidence, along with the testimony of Smith's wife and employer, the court determined that Smith had been subject to convulsive seizures since age six; that these seizures have continued with some degree of regularity; that he had no convulsive seizures

for about two years prior to the accident; that he suffered a seizure while in the hospital about twelve days after the accident; and that his raging and maniacal condition prior to the seizure while he was in the hospital indicates that Smith not only suffers from occasional attacks of epilepsy, but also from some personality disorder which affects his activity. The court, relying primarily upon the testimony of Dr. Frederick G. Woodson, an expert witness described as "specialty board certified" in neurology and psychiatry, concluded that while the injury to the head did not aggravate the epilepsy grand mal[1] condition, there was *some aggravation of the personality disorder which accompanied the epileptic condition.* Therefore, the court allowed Smith the equivalent of six months' salary for the temporary aggravation based upon his proven earning capacity over the eighteen months preceding the injury, plus an allowance for medical expenses, pain and suffering.

Smith contends that the award is *grossly inadequate* since Drs. Sawyer, Maddock and Thrasher testified that the injury did aggravate the epileptic condition, if one existed, and that he was permanently disabled. Based upon his earning capacity as shown by the eighteen months preceding the injury and his life expectancy of 42.53 years, Smith claims that the award should have been in excess of $120,000.

The problem confronting the doctors in this case is the inconsistency in the medical records of the army and its medical reviewing boards. Summarizing briefly, these records show that Smith enlisted in the Army Air Force on January 31, 1946. He remained in the service until December 17, 1946, at which time he was given an honorable medical discharge, the as-

signed reason being "epilepsy, grand mal, psychomotor". He was given a 100% disability pension. After being discharged from the army, Smith was placed in the Veterans' Hospital at Kecoughtan, Virginia, for further care. Upon his release from the hospital, Smith took G. I. training as a brick mason for nine months. He had difficulty learning the trade so he quit and worked at various laboring jobs for about four months, at which time he returned to the hospital. Later he resumed training as a brick mason, suffered a convulsive attack and was again hospitalized. Sometime during this period his disability pension was reduced to 50% of the original amount. Upon being again released from the hospital, he worked intermittently as a laborer until redrafted through Selective Service in 1952. On February 4, 1953, the Army Medical Board reviewed Smith's medical history and concluded that the earlier diagnosis of epilepsy grand mal in 1946 could not be sustained; that the diagnosis of epilepsy was made primarily on history and that "[t]he negative EEG[2] findings with this type of history is strongly suggestive of hysteroid phenomena under frustration and in a 'temper tantrum' rather than psychomotor epilepsy". With this diagnosis Smith lost his disability pension and remained in the army until June 1954. Thirteen months of this tour of duty were spent in Korea.

Upon discharge in June 1954, Smith resumed laborers' work until February 1956 when he entered the Veterans' Hospital at Kecoughtan. Once again Smith's medical records were reviewed and on May 14, 1956, it was decided that the 1953 diagnosis of passive-agressive personality, aggressive type was clearly and unmistakenly in error; that the one sole

1. Epilepsy is defined in Maloy, Medical Dictionary for Lawyers (1942), as characterized by fits or attacks accompanied by loss of consciousness, and violent convulsive motions or jerking of the muscles. Grand mal is the name given for a severe form of epilepsy.

2. The E. E. G. stands for electroencephalogram which, as explained by Dr. Walter W. Sawyer, Jr., is commonly called a brain wave test to record the electrical patterns of the brain. It is a valuable diagnostic aid in cases where epilepsy is suspected. In the instant case, the electroencephalogram tests given Smith indicated a "borderline slow" record.

diagnosis was epilepsy grand mal and severe psychomotor attacks. With this diagnosis Smith was given a 40% disability pension which he still receives. It may be noted that throughout these medical records a history of convulsive seizures, dizziness and headaches is apparent. As pointed out earlier, Smith's activities, as evidenced primarily by his work record, from 1956 to the date of the accident, indicate few, if any, convulsive seizures. Additionally, the records disclose that Smith took very little medication for his condition prior to the accident whereas, since the accident, he has been regularly taking a variety of prescribed medicines.

With these somewhat confusing, unsatisfactory and inconsistent records furnishing the only real source of information as to Smith's history, it is not surprising that the medical experts differed in their opinions. However, when it is accepted, as we feel it must be, that the records as a whole disclose a pre-existing epileptic condition accompanied by a rather severe personality disorder as evidenced by the "temper tantrums", we are of the opinion that the District Court acceptably and properly resolved the conflict.

The basic question arose as to whether the pre-existing epileptic condition was aggravated by the injury to the head resulting from the fall from the ladder. Drs. Thomson and Woodson, the two experts called by Vessel, expressed the opinion that, in view of Smith's epileptic history both before and after the accident, they could not say that the accident aggravated the condition. These opinions were based upon the medical records which indicated that the convulsive seizures were about as frequent before as after the accident. There is also a history of personality disorder and since the "board certified" specialist,

Dr. Woodson, testified that such condition could be aggravated by the injury, we conclude that Smith's condition and behavior since the accident are adequately explained. In clarification of the army records, Dr. Woodson stated that, in his opinion, the diagnosis of both epilepsy and personality disorder was basically correct. His reason for this opinion is that in the one instance, from October 1952 to February 1953, the army doctors observed no convulsive seizures but recorded a great amount of abnormal activity, thus indicating to those doctors a personality disorder with such diagnosis supported by the medical history. On the other hand, when the diagnosis of epilepsy grand mal was made, the doctors had records of convulsive seizures upon which to base their determination. In view of a history of both conditions, a diagnosis of either could possibly be based upon the patient's conduct or behavior during the course of observation.

■ For these reasons, we are of the opinion that the District Court's determination as to damages is supported by substantial evidence and must not be disturbed by this court.[3]

The only remaining question is whether the District Court erred in dismissing the Vessel's claim over against Stevedores. Vessel contends that since a shipowner is entitled to indemnification for all damages sustained as a result of a stevedore contractor's breach of its warranty of workmanlike service, it is entitled to full indemnification because the safety man, Spellman, observed that the ladder was without bolts yet failed to make a more thorough inspection which would have disclosed that the ladder was not safe for use. Stevedores, on the other hand, insist that the warranty arises only because they are experts in loading or discharging vessels and, for that reason, extends only to the handling of

3. The District Court heard the testimony of the witnesses, including the doctors, examined Smith's service records, hospital records and Veterans' Administration records. It determined that the accident caused "some temporary aggrava- tion of the libellant's pre-existing personality disorder". This finding should not be disturbed unless clearly erroneous. See McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20; Spanos v. The Lily, 4 Cir., 1959, 261 F.2d 214.

cargo and the use of equipment incidental thereto; that a ladder providing access to a hold in which the work is to be done is not within the contemplation of "equipment incidental thereto"; that even though a contractual obligation to inspect the ladder existed, such obligation was not breached because the safety man thought the ladder was welded; and the fact that three men were able to use the ladder without incident serves to conclusively demonstrate the correctness of the judgment of the safety man that the ladder could be used without danger.

Vessel relies upon Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413, in support of its contention. In Crumady the ship furnished the stevedore with a boom rigged for three tons but with its winch set by the ship's crew to cut off at six tons, twice the rated limit of the rigging. The Supreme Court concluded that this was no different in principle from loading or unloading cargo with cable or rope which lacked the test strength for the weight of the freight to be moved. In both cases, the vessel is rendered unseaworthy. Therefore, the court held that since the negligence of the stevedores, which brought the unseaworthiness of the vessel into play, amounted to a breach of the warranty of workmanlike service, the vessel may recover over. Vessel, placing itself in the position of the ship in Crumady, contends that even though it furnished Stevedores with an improperly secured ladder, recovery over is not barred because Stevedores brought the unseaworthy condition into play by failing to properly inspect the ladder after they had notice of its defect.

■ We are of the opinion that the District Court improperly dismissed the action over against Stevedores. In Weyerhaeuser S. S. Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 567, 78 S.Ct. 438, 441, 2 L.Ed.2d 491, the Supreme Court, after stating that the stevedore's contractual obligation to perform his work with reasonable safety related not only to handling of cargo, but also to the use of equipment incidental

thereto, said: " * * * If in that regard respondent rendered a substandard performance which led to foreseeable liability of petitioner, the latter was entitled to indemnity absent conduct on its part sufficient to preclude recovery. * * * " While a standard to be applied to "conduct * * * sufficient to preclude recovery" has not been created, it has been decided that the mere furnishing of defective equipment by the ship to the stevedore does not bar recovery over under the contract. Crumady v. The Joachim Hendrik Fisser, supra; Calmar S. S. Corp. v. Nacirema Operating Co., 4 Cir., 1959, 266 F.2d 79; American Export Lines, Inc. v. Revel, 4 Cir., 1959, 266 F.2d 82.

■ Stevedores, by and through their safety man, "rendered a substandard performance which led to foreseeable liability" of Vessel. We do not agree with the District Court that indemnification under the facts of this case would make stevedoring companies guarantors of any accident which may occur on board vessels which they are loading or discharging. Their standard of performance has been well defined—to do the job properly and safely. Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp. 1956, 350 U.S. 124, 133, 76 S.Ct. 232, 100 L.Ed. 133. This standard is not met when Stevedores' safety man is placed on notice that a bolt type ladder, which is to be used by the longshoremen to gain access to a place of work, is not secured by bolts. Although the safety man, Spellman, testified that both foreign and American ships "often" have these ladders welded, Thomas Scott III, a marine surveyor called on behalf of Vessel, stated that in all his experience he has never seen a welded ladder located in the square of the hatch. When the marine surveyor's testimony is considered, with only a cursory glance at the exhibited photographs of the ladder the conclusion is inescapable that the safety man should have taken steps to properly discharge his duty to further inspect. While welds are observable on the ladder, a man in the position of safety man must be held to

181

know that a weld on or about the ladder does not indicate that it is *secured* by welding simply because both the plates attached to the ladder and those attached to the hatch coaming through which the securing bolts are placed are welded into position. In short, *he must not assume* that a safe condition exists when he has notice that such may not be the case; and his judgment is not vindicated by the fact that three men used the ladder without incident before the accident.

Although the contractual obligation of Stevedores in this case arises through implication by the conduct of the parties, we are of the opinion that such contract was binding. Restatement, Contracts § 5 (1932). As is stated in Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 1956, 350 U.S. 124, 133, 76 S.Ct. 232, 237, 100 L.Ed. 133:

> " * * * This obligation is not a quasi-contractual obligation implied in law or arising out of a noncontractual relationship. It is of the essence of petitioner's stevedoring contract. It is petitioner's warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured products. * * * "

In Ryan, at page 134 of 350 U.S., at page 237 of 76 S.Ct. the Supreme Court answered Stevedores' suggestion that we leave the field of contract and get into the field of negligence by measuring the extent of the safety man's duty. The court said:

> " * * * The shipowner's action is not changed from one for a breach of contract to one for a tort simply because recovery may turn upon the standard of the performance of petitioner's stevedoring service."

The judgment of the District Court in favor of Smith and against the vessel and her owner is affirmed. The case is remanded with direction to enter judgment for Jugosalvenska Linijska Plovidea and the vessel SRBIJA against Hampton Roads Stevedoring Corporation.

Affirmed in part, reversed in part and remanded.