**CIA MARITIMA DEL NERVION,**
Appellant,

v.

**JAMES J. FLANAGAN SHIPPING CORPORATION, STEVEDORE DIVISION,** Appellee.

No. 19492.

United States Court of Appeals
Fifth Circuit.

Sept. 18, 1962.

Edward W. Watson, Galveston, Tex., for appellant.

Bryan F. Williams, Jr., Galveston, Tex., for appellee.

Before CAMERON, WISDOM and GEWIN, Circuit Judges.

WISDOM, Circuit Judge.

Leo Stagg, a longshoreman, brought a libel against the Mar Tirreno, a cargo vessel, for personal injuries suffered while aboard the ship. Seeking indemnity for the amount for which it might be liable, Cia Maritima del Nervion, owner of the vessel, impleaded James J. Flanagan Shipping Corp., Stagg's stevedore employer. Flanagan cross-libeled for the compensation and medical expenses it had paid Stagg under the Longshoremen's and Harborworkers' Act. Nervion, after settling with Stagg for $17,500, was denied indemnity by the District Court and was ordered to pay Flanagan $1,867.96 to cover the stevedore's payments to Stagg. Nervion appeals from this judgment. The appellant shipowner's position is that the stevedoring company breached its warranty of safe and workmanlike performance by failing to make a prior inspection of the hold in which the longshoremen were to work and by inadequately supervising the men; that this alleged breach of warranty entitles it to indemnity for the damages sustained. We find this contention lacking in merit, and we affirm the judgment below.

## I.

July 22, 1958, the Mar Tirreno, a Spanish general-cargo vessel, arrived at Port Arthur, Texas and took on a load of petroleum coke in her No. 2 lower hold. This coke is a fine, jet-black substance, loaded by means of a chute, so that no longshoremen were used in the hold before or during the loading. The hatch was closed after loading. Except for a surveyor from the National Cargo

Bureau, who inspected the ship when the coke was taken on, the No. 2 hold was not entered until the ship reached Beaumont two days later. At ten o'clock that morning a gang of longshoremen came aboard to level the coke. The hatch had been reopened about thirty minutes before work was to begin. Stagg, the libellant, was the first man down the fixed steel ladder into the No. 2 hold. A few feet above the level of the coke, he lost his footing. At that point one rung of the ladder was missing and the rung below it was bent downward. Stagg managed to hold onto the ladder, but he wrenched his back so severely that he was permanently disabled.

Stagg worked by the job for different stevedores. On the morning of the accident, he and the other members of his gang were hired at the Union Hall and worked under the direction of Droddy, Flanagan's "walking foreman," and its stevedore superintendent, Jordan. It is undisputed that no inspection, however cursory, was made of the ladder or other parts of the No. 2 hold, where the longshoremen would be working. It is not clear, however, as the appellant insists, that merely looking down the ladder into the hold would have revealed the defect in the ladder. Although on the morning in question the hatch was completely open to a bright summer sky and cluster lights had been lowered at the four corners of the hatch, there was testimony that the silt-like, jet-black coke was light absorbent and provided no reflection for the sun's rays or the artificial lighting. Since the missing and bent rungs were about four feet from the coke and about eight feet in the lower hold below the 'tween deck, it is not clear from the evidence in the record that anything other than a careful inspection or an actual descent at least part way down the ladder would have disclosed the defect.

It was not customary to make such an inspection. On this the record is explicit. Stagg, a longshoreman of fifteen or sixteen years experience, testified that he knew of no custom of stevedores' sending someone into the hold to make an inspection before work began. Droddy's testimony was to the same effect. Jordan, the superintendent, was asked, "[Y]ou have no fixed rule for your walking foreman to follow that covers going down in the hold first and looking around, or checking on the lighting, or checking on the ladders, or things of that kind?" He replied: "Let me say this. I have been on the waterfront a long time, and I have worked a hold many a time, with all different kinds of men, and that instruction, I have never heard of before, until right then. I never heard anybody mention that kind of instruction." Egurrola, chief mate of the Mar Tirreno, also testified that it was not customary, in Gulf Coast ports, for longshoremen to refrain from beginning work until a representative from the stevedore company checked the holds. Miss Flanagan, vice president, secretary and treasurer of the Flanagan Shipping Corp., stated that it was not a practice to have an inspection because of the expense to the ship owners in paying the men while they were waiting. Only the testimony of Lluch, second mate of the Mar Tirreno, could be construed as indicating that there was usually an inspection. But the second mate was speaking through an interpreter. In view of the agreement in the testimony of the other witnesses, including that of the chief mate, the marked failure of communication between examining counsel and Mr. Lluch, which is clear at several places in the record, and the later indication that Lluch was probably referring to the surveyor from the National Cargo Bureau, the district judge properly discounted his statement.

On this evidence, the district judge found that the defective ladder at the No. 2 hatch, which rendered the vessel unseaworthy, was the sole cause of Stagg's injury and that Flanagan, the stevedore, having accorded Stagg, "all of the normal supervision given to longshoremen generally," had contributed in no way to his injury.

## II.

 It has been clear since Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, that the shipowner's action for indemnity is not founded upon a tort or any duty which the stevedore owes its employee, but rather upon the contract between the shipowner and the stevedore and the stevedore's implied warranty of workmanlike service in stowing the cargo. This contractual obligation to perform the duties with reasonable safety extends not only to the actual handling of cargo, but to the "use of equipment incidental thereto" as well. Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 1958, 355 U.S. 563, 78 S.Ct. 438, 2 L.Ed.2d 491. And, even though the vessel or its equipment may themselves be unseaworthy, if the stevedore brings this condition into play, he is liable to indemnify the owner for any damages which may be sustained because of the breach of warranty. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Calmar Steamship Corp. v. Nacirema Operating Co., 4th Cir. 1959, 266 F.2d 79, cert. den. 361 U.S. 816, 80 S.Ct. 56, 4 L.Ed.2d 62. See Halliburton Co. v. Norton Drilling Co., 5th Cir. 1962, 302 F.2d 431, 434–435. But the stevedore is not an insurer or guarantor of any and all accidents which may result in injury to a longshoreman working on the vessel. The stevedore's negligence which breaches his warranty of workmanlike performance is a question of fact, to be decided by the trier of fact, and it cannot be redetermined by this court unless it is manifestly against the weight of the evidence. See Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959); Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). See also, Norris, The Law of Maritime Personal Injuries (1959) § 55, p. 152. On the record before us, we cannot hold that the District Court clearly erred in finding that "in performing its stevedoring services aboard M/V Mar Tirreno on the occasion in question, Flanagan acted in a safe, reasonable and workmanlike manner and in all respects complied with the standard of performance which it impliedly warranted under its agreement with Nervion."

The appellant, however, urges that "the standard of performance warranted by a stevedore is not limited to the usual and customary practices" and that the stevedore is under a duty to note "visual defects" and take any precautions which such notice would require. This is especially true, the appellant suggests, in the case of ship's ladders; for a stevedore, who handles all types of cargo, is bound to be aware that ladders, even when made of metal, are highly susceptible to damage in a cargo ship's hold and frequently have loose or missing rungs.[1]

 It is true, of course, that "compliance with the customs and practices of an industry is not in itself due care," Schlichter v. Port Arthur Towing Co., 5th Cir., 1961, 288 F.2d 801, cert. den. 368 U.S. 828, 82 S.Ct. 50, 7 L.Ed.2d 32, but it is evidence of due care. When the fact finder has relied on such evidence, his findings will not lightly be disregarded unless there is a particularly strong showing of the unreasonableness of the customary practice. In Curtis v. A. Garcia y Cia, Ltda., 3d Cir. 1959, 272 F.2d 235, the Third Circuit refused to overturn a jury finding that the stevedore's method of unloading, although customary at the port in question, was negligent. Here we are asked to reject a finding by the trier of fact that a practice, in accordance with custom, was *not* negligent. We are asked to establish, as part of the

1. The frequency with which ladders are damaged is indicated by the repair work done on the Mar Tirreno itself. In its annual repair job in March or April of 1958, sixty bent rungs had to be straightened and twenty-five more, which were completely missing, had to be replaced. From that time until the next over-all annual repair job, twenty rungs had to be replaced in hold No. 2 alone.

stevedore's standard of a safe and workmanlike performance, a rule of law that failure by a stevedore to make a thorough inspection of a ship for any "visual defects" before work by his longshoremen commences, will subject him to liability for any injuries occurring to the longshoremen because of these defects. Neither prior cases nor the practicalities of the situation point to such a result.

Courts allowing indemnity against the stevedore when a longshoreman has been injured through a defect in a ship's ladder or other similar equipment have done so, uniformly, only when the stevedore had actual notice of the hazardous situation and failed to take any steps to remedy it. In Santomarco v. United States, 2d Cir. 1960, 277 F.2d 255, the stevedore was held liable to the shipowner when a longshoreman was injured by slipping on a spot of oil on the ship's deck. The oil had been seen and walked through by the longshoremen "who did not call the attention of any of the ship's company to it, or ask to have it wiped up or sprinkled with sawdust," and who "could have wiped up the oil themselves." In Smith v. Jugosalvenska Linijska Plovidea, 4th Cir. 1960, 278 F.2d 176, Smith was thrown to the 'tween deck when the ladder which he was climbing down came loose and swung away from the hatch coaming. The liability of the stevedore, however, was predicated explicitly upon the fact that the stevedore's safety man had noticed "that the ladder in question was not secured by bolts although it was a bolt type ladder," and had done nothing more to investigate or remedy the obvious possibility of danger to anyone descending the ladder. "In short, he *must not assume* that a safe condition exists when he has notice that such may not be the case * * *." [Emphasis in original] 278 F.2d at 180. Both in Santomarco and Smith the stevedore had actual notice of a dangerous working condition. Neither stands for the proposition that the stevedore has a duty to make a thorough inspection of the ship.

On the other hand, where there has been no notice of a damaged or faulty ladder, the courts have not implied a hypothetical duty to inspect, and the stevedore has not been required to indemnify the shipowner. In Calderola v. Cunard Steamship Co., 2d Cir. 1960, 279 F.2d 475, the injury occurred when an employee slipped because of grease on the ship's ladder. The court held that there was no evidence that the stevedore or any of its employees knew of the grease on the ladder until the longshoreman put his hand in it as he was climbing up, and that since the grease could have been on the ladder only a short time before the accident, "it would be unreasonable to require the stevedore to have discovered the grease in the course of normal routine." Similarly, in Ferrigno v. Ocean Transport, Ltd., S.D.N.Y. 1961, 201 F.Supp. 173, the court held that the stevedore was not liable for breach of an implied warranty of workmanlike service[2] where a longshoreman, descending a ladder and realizing that a rung was missing, reached with one foot beyond the missing rung for the next step below, and fell when the rung he was holding gave way. The stevedore had actual notice of the missing rung, and the question was whether he was under a duty to inspect to discover other possible defects, including the second, loose rung which caused the accident. The court was "unable to find any authorities * * * which place upon a stevedore a duty to discover and remedy latent defects, of which it was not informed by the shipowner or other responsible party." 201 F.Supp. at 184. The Second Circuit has stated it even more strongly:

> "[A]n implied warranty of workmanlike performance by a stevedore does not place upon him a duty to discover defects in the apparatus or equipment furnished by the vessel being loaded or unloaded which

2. Recourse against the stevedore for indemnification was, however, ultimately allowed in Ferrigno through the court's construction of an express indemnity clause.

are not obvious upon a cursory inspection." Ignatyuk v. Tramp Chartering Corp., 2d Cir. 1957, 250 F.2d 198, 201.

A cursory glance down a long ladder into a hold filled with powdery black coke would not necessarily have revealed the missing and bent rungs, and the cases, given their most favorable interpretation to the appellant, require no more than this. There is good reason for there being no practice or requirement of a survey. A ship in port must get underway as quickly as possible, and without the expense, delay, and interference with the ship's equipment which a complete inspection would entail. "Certainly the shipowner would not only object but would prohibit the dismantling of every piece of ship's gear, such as winches, lights, etc. in a professed effort by the stevedoring company to ascertain whether or not the ship's own appurtenances were seaworthy." Ray v. Compania Naviera Continental, S.A., D.Md. 1962, 203 F.Supp. 206, 211. Testimony in the present case indicates that even a less thoroughgoing inspection of merely the holds, ladders, and walkways would have been prohibited. Egurrola, the chief mate of the Mar Tirreno, testified that he would not have allowed loading and trimming operations to be delayed in order for a representative of the stevedoring company to check all holds and ladders. Miss Flanagan, the stevedoring firm's vice president, secretary and treasurer, when asked what would have been the reaction of the owners of the vessel had the longshoremen been delayed getting onto the ship while a thorough survey was made, put it more pithily with the answer, "They would have gone sky high." Jordan, Flanagan's superintendent, stated at slightly greater length: "[A]s far as going in every hold, you can't require that of any man, because they don't have time. * * * If you got to stop and inspect every ship, that would cost somebody a lot of money." It would seem, then, that from the nature of their trades, neither ship officers, stevedores, or longshoremen expect or wish inspection of cargo ships.

This is not to say that prior inspection is not desirable. In many instances a survey of the area where the longshoremen are to work, particularly if heavy or bulky cargo or machinery has recently been moved in or out, would reveal conditions dangerous to the health and safety of the men which could be either remedied or avoided. Nonetheless, neither reasonable practices nor prior decisions nor the peculiar conditions of the stevedoring trade in general or of this specific situation in particular give any warrant for overturning the district court's factual finding that Flanagan "acted in a safe, reasonable and workmanlike manner." Nor can we say, as a matter of law, that failure to make a prior inspection is a breach of the standard of performance which a stevedore impliedly warrants to the shipowner.

The judgment of the court below is Affirmed.