**ATLANTIC & GULF STEVEDORES, INC., et al., Plaintiffs,**
v.
**SKIBS A/S DANMOTOR et al., Defendants.**
Civ. A. No. 69–G–126.
United States District Court,
S. D. Texas,
Galveston Division.
Oct. 14, 1971.

Dixie Smith, Fulbright, Crooker & Jaworski, Houston, Tex., for plaintiffs.

Ben N. Ramey, of Ramey & Clay, Houston, Tex., Edward W. Watson, of Eastham, Watson, Dale & Forney, Galveston, Tex., for defendants.

## MEMORANDUM AND ORDER

NOEL, District Judge.

This suit arises from an injury sustained by James P. Grace, a longshoreman, while he was working aboard the vessel ALEX in the harbor at Galveston, Texas. The vessel was owned and operated by defendant Skibs A/S Danmotor, which settled the longshoreman's third-party claim against the vessel. The instant action is brought by Atlantic & Gulf Stevedores, Inc., the longshoreman's employer, and Texas Employers' Insurance Association, the compensation carrier, to recover from defendant Danmotor the amount of compensation payments to Grace, medical expenses, and attorney's fees. Also joined as defendants are Grace and his attorney. In turn, defendant Danmotor counterclaims seeking indemnity for the amount of its settlement with Grace, as well as its fees and expenses incurred in defending Grace's claim.

## FINDINGS OF FACT

(1) On the morning of February 4, 1966, Mr. Grace's gang was assigned to unload cargo from the Number 3 hatch of the ALEX, which was berthed starboard-side to the dock at Galveston. Located at the forward end of the open hatch, and secured at the base of a large mast on the centerline of the ship, was a jumbo boom served by four winches. The boom was fifty-seven feet long and had a load capacity of twenty-five tons.

(2) The longshoreman made only the most cursory inspection of their work area. No defects in the rigging of the boom or mast were perceived.

(3) The cargo consisted for the most part of large boxes or crates. The crate being removed from the hold at the time of the mishap was quite large, being only slightly smaller in length than the hatch itself, and approximately twelve feet in height. It weighed between fifteen and twenty tons.

(4) Mr. Grace was operating one of the offshore winches which controlled a guy-wire used to swing the load laterally to the dock and back again to the ship.

(5) After the hook on the boom had been secured to the crate, the load was lifted by means of a winch operated by longshoreman Milina.

(6) The angle of the boom was controlled by a winch operated by longshoreman Bolton. After the crate had been lifted vertically to a point where its bulk had cleared the hatch by about two feet, it was swung laterally toward the dock. At this time, the angle of the boom was approximately fifty degrees.

(7) When the crate was part way through its lateral swing, two objects suddenly fell from the rigging above the longshoreman's work area. One of these struck Grace on the head, producing the injury which led to this suit.

(8) The falling objects were a steel half-collar and steel pin, which were parts of a device used to secure the jumbo boom when the ship is at sea. When not in use, the boom is held in a vertical position against the mast and fastened by a round steel collar located approximately fifty feet above deck and consisting of two semicircular pieces. One of these steel halves is permanently affixed to the mast. The other half, which is moveable and weighs approximately fifteen pounds, is fastened to the mast by two large steel pins, one on the port and one on the starboard side of the mast. These pins are about seven inches long, one inch in diameter, weigh about five pounds apiece, and are slightly tapered in shape.

(9) When the jumbo boom is being prepared for use, the pin on the port side is removed and stowed at the base of the mast. This permits the half-collar to swing open, held only by the remaining starboard side pin which operates as a sort of hinge, thus freeing the boom to be lowered from its vertical storage position.

(10) The object which struck Grace was the pin which is supposed to hold the half-collar to the mast in its open position. The other object, which missed Grace, was the half-collar itself.

(11) No credible evidence was adduced to show exactly why the collar and pin fell. It was established that the ship listed slightly to starboard with the swinging of the load, and that the laboring of the winches caused vibration, but that neither the list nor the vibration exceeded what was normal for such an operation.

(12) The ship has offered a theory; to wit, that the boom was improperly operated by the longshoremen in that it was raised too high, causing the block and wires at the mast end of the topping lift to entangle the collar and knock it down. In support of this hypothesis, deposition testimony of the chief mate was offered to prove that the collar was dislodged in this fashion when the boom was raised as high as sixty-five to seventy degrees above the horizontal. The Court is not persuaded by this version.

(13) To the contrary, Longshoreman Bolton, whose winch controlled the elevation of the boom, testified that he did not hear or feel anything to indicate that the boom gear had contacted the collar or otherwise become fouled. The pin and collar bore no visible signs of damage to suggest that they had been subjected to impact other than their fall.

(14) Additionally, the live testimony of Longshoreman Burns, who was acting as signalman and had the best opportunity to observe, was to the effect that the angle of the boom never exceeded fifty degrees. Such an angle would be fully consistent with the large dimensions of the load, and the Court finds that the angle of the boom at its maximum elevation was fifty degrees.

(15) The Court further accepts the expert testimony to the effect that it would be physically impossible for the boom at the described angle to strike the collar. It follows that improper operation of the jumbo boom did not cause the collar and pin to fall.

(16) There was a conflict between deposition and live testimony as to whether a warning was given by members of the ship's crew shortly before the occurrence. The Court accepts the consistent version of the live witnesses and finds that no warning was given. Even if an alarm were given, as maintained by defendant's deponent, it was uttered too late to have been effective and cannot be regarded as a warning.

(17) Finally, it is found as facts that:

(a) the longshoreman and stevedore were rendering workmanlike performance at the time of the accident, and

(b) the ship's gear was not reasonably fit for its intended purpose.

## CONCLUSIONS OF LAW

### I.

Immediately after receiving the evidence, the Court expressed the opinion that an allocation of damages upon a basis of relative fault would do justice and would produce a recovery against the ship for 75% and against the stevedore for 25%. This disposition was prompted by the Court's reluctance to completely exonerate the stevedore, in view of the fact that a more careful examination of the longshoremen's work area—including scrutiny of the equipment overhead—might well have prevented the accident. The parties were invited to brief the law respecting the applicability of comparative negligence and contribution principles in the present context. The Court also indicated that, should it develop that allocation is inappropriate, the ship should be cast in full liability. Upon review of the authorities, it now appears that this is an instance in which the vaunted flexibility and creativity of admiralty has been indeed slow to respond to what is arguably a felt need.

The development of the longshoremen's remedy through its *Sieracki-Ryan* [1] progression is an oft-told story

---

1. Seas Shipping Company v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), established that the ship's obligation of seaworthiness extended to long-

which need not be repeated here.[2] Suffice it to say that the longshoreman has regained through judge-made substantive and procedural law more than he lost by reason of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 et seq., and has even surpassed the seaman in the variety of his remedial options. The ship which he loads or unloads now owes him an absolute duty of seaworthiness—liability without fault—which may be enforced by a suit for damages. In turn, the ship may visit its liability upon another by seeking indemnity from the stevedore-employer for breach of the latter's express or implied contractual warranty of workmanlike performance. Whatever the merits of this procedural convolution, and they have been seriously questioned,[3] the upshot is that the injured longshoreman may have his workmen's compensation protection as well as a double-targeted lawsuit against the ship, and, in effect, the stevedore-employer.[4]

One irrational side-effect of the longshoreman-ship-stevedore triangle described above is that the loss of the first often falls upon either of the latter two in an indiscriminate manner which might well be described as "whole hog". Either the ship or the stevedore customarily absorbs the total judgment, notwithstanding the fact that both may have causally contributed to the mishap. This state of affairs is an anomoly in admiralty, where the salutary principles of comparative negligence and division of damages are well entrenched. Examples of this flexibility in rationally allocating the burden of accidental injury are the reduction of recoveries by reason of contributory negligence, cf. The Max Morris, 137 U.S. 1, 11 S.Ct. 29, 34 L.Ed. 586 (1890), and the moiety rule in collision cases. Cf. The Schooner Catherine v. Dickinson, 58 U.S. (17 How.) 169, 15 L.Ed. 233 (1855); Griffin on Collision, 558–566 (1949); see generally Staring, Contribution and Division of Damages in Admiralty and Maritime Cases, 45 Calif. L.Rev. 304 (1957).

Prior to 1952, the lower courts experimented with shipowner/stevedore contribution in mutual fault cases. See Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L.Q. 381 (1954) and cases cited at 419 n. 170. In 1947, the Supreme Court appeared to suggest that an application of the contribution principle in a longshoreman's tripartite suit would be entirely appropriate and in keeping with the traditions of the admiralty. In American Stevedores, Inc. v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011 (1947), a longshoreman sued the United States as owner of a ship upon which

---

shoremen. A decade later, in Ryan Stevedoring Company v. Pan-Atlantic Corporation, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), the Court held that a stevedoring contractor who enters into a service agreement with a shipowner is liable to indemnify the shipowner for damages sustained as a result of the stevedore's breach of its warranty of workmanlike performance.

2. See Generally: Gilmore & Black, The Law of Admiralty, 358 et seq. (1957); Norris, Maritime Personal Injuries, 130 et seq. (1959); Baer, Admiralty Law of the Supreme Court, 193 et seq. (1969).

3. See, e. g., Mr. Justice Black's dissent in Ryan Stevedoring Company v. Pan-Atlantic Corporation, 350 U.S. 124, 135, 76 S.Ct. 232, 100 L.Ed. 133 (1956); Circuit Judge Friendly's dissenting reference to "judicial legerdemain" in Skibinski

v. Waterman S.S. Corp., 360 F.2d 539, 544 (2nd Cir. 1966), certiorari denied 387 U.S. 921, 87 S.Ct. 2027, 18 L.Ed.2d 975 (1967); Shields & Byrne, Application of the Unseaworthiness Doctrine to Longshoremen, 111 U.Pa.L.Rev. 1137 (1963); Mank, The Stevedore: Hope for Rescue, 56 A.B.A.J. 254 (1970); Proudfoot, "The Tar Baby": Maritime Personal Injury Indemnity Actions, 20 Stan.L.Rev. 423 (1968).

4. This despite the Longshoremen's Act's express provision that "(t)he liability of an employer [under the Act] . . . shall be exclusive and in place of all other liability of such employer to the employee . . . . on account of such injury . . . . ." 33 U.S.C. § 905. Watson v. Gulf Stevedore Corporation, 374 F. 2d 946 (5th Cir. 1967), certiorari denied 389 U.S. 927, 88 S.Ct. 286, 19 L. Ed.2d 277 (1967).

he was injured, and the Government impleaded the stevedore-employer seeking to recover upon an indemnity provision of the stevedoring contract. The District Court, holding that both the shipowner and the stevedore were negligent, ordered a 50%–50% contribution by the joint tortfeasors. The Court of Appeals modified the decree upon its determination that the stevedore was obliged by its contract to make the shipowner completely whole. The Supreme Court remanded the case for further construction of the contract's indemnity provision. In so doing, the Court noted that:

> . . . the parties may have intended that American (the stevedore), in case of the joint negligence of the parties, should be responsible for that proportion of the damages which its fault bore to the total fault. Although the usual rule in admiralty, in the absence of contract, is for each tortfeasor to pay the injured party a moiety of the damages, we do not believe that the last alternative, which provides for a measure of comparative negligence, is necessarily beyond the intent of the parties. Comparative negligence is not unknown to our maritime law. (Citations omitted.)

330 U.S. at 458, 67 S.Ct. at 853.

Five years later, in Halcyon Lines v. Haenn Ship Ceiling & Refitting Corporation, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952), it became apparent that the seeds sown in the contribution cases had fallen upon barren ground. The plaintiff in *Halcyon* had been injured while repairing a ship upon navigable waters. He sued the shipowner, alleging negligence and unseaworthiness, and the shipowner joined plaintiff's employer as a third-party defendant. The trial court entered judgment against the shipowner and employer, each to bear fifty percent of plaintiff's recovery. The Court of Appeals agreed as to the right of contribution, but the Supreme Court reversed. Erect-

ing what United States District Judge Bue has called "the legal roadblock of the rule against contribution between joint tortfeasors", cf. C. O. Bue, Admiralty Law in the Fifth Circuit I, 4 Hou.L.Rev. 347, 410 (1966), the Court observed that the admiralty version of contribution had never been expressly applied in a non-collision context, and should be adapted to maritime personal injury litigation only through legislative action. Concluding that the diverse interests and numerous imponderables involved in re-ordering the existing remedial scheme presented a question ill-suited to judicial resolution, the Court stated:

> The legislative process is peculiarly adapted to determine which of the many possible solutions to this problem would be most beneficial in the long run. A legislative inquiry might show that neither carriers, shippers, employees, nor casualty insurance companies desire such a change to be made. . . . Should a legislative inquiry convince Congress that a right to contribution among joint tortfeasors is desirable, there would still be much doubt as to whether application of the rule or the amount of contribution should be limited by the Harbor Workers' Act, or should be based upon an equal division of damages, or should be relatively apportioned in accordance with the degree of fault of the parties.

> In view of the foregoing, and because Congress while acting in the field has stopped short of approving the rule of contribution here urged, we think it would be inappropriate for us to do so.

342 U.S. at 286, 72 S.Ct. at 280.

Four years later, the *Ryan* case made it possible, and often quite convenient, for the shipowner to shift his loss to the stevedore. Although this introduced flexibility of a crude sort, the contractual theory underpinning *Ryan* obviously did

not lend itself to application of a tort principle such as contribution.[5]

■ In the instant case, defendant Skibs urges that this conceptual barrier is surmountable by simply striking an equitable accommodation between the culpable parties, not as joint tortfeasors but as breachers of reciprocal contractual duties. It is suggested that the Court fashion a damage allocation arrangement on the basis of the stevedore's warranty of workmanlike performance and the ship's contractual obligation to provide a place where the stevedore's employees might work in reasonable safety. Cf. Pettus v. Grace Line, Inc., 305 F.2d 151 (2nd Cir. 1962) (Clark, J., dissenting). Such an approach might find a hospitable appellate reception, especially in view of a provocative 1966 footnote by the Fifth Circuit to the effect that the process of deciding tripartite longshoremen's suit "is inevitably a comparative one . . . perhaps justifying comparative techniques sometimes." D/S Ove Skou v. Hebert, 365 F.2d 341, 351 n. 18 (5th Cir. 1966)[6]

However, the hard fact remains that such an arrangement, albeit couched in contractual terms, would be the functional equivalent of what was forbidden in *Halcyon*; to wit, a partial recovery by a longshoreman against his statutorily immune employer. Cf. Horton & Horton, Inc. v. T/S J. E. Dyer, 428 F.2d 1131 (5th Cir. 1970), certiorari denied, Horton & Horton, Inc. v. Vaughn Marine, Inc., 400 U.S. 993, 91 S.Ct. 461, 27 L.Ed.2d 441 (1971). For reasons which appear below the facts of the case at bar do not present an occasion so compelling as to justify departure from the *Halcyon* doctrine. Sound respect for controlling precedent, coupled with a recognition that the fundamental restructuring of remedies is appropriately a legislative function, require this Court to adhere to the view expressed by Judge Friendly speaking for the Second Circuit in McLaughlin v. Trelleborgs Angfartygs A/B, 408 F.2d 1334, 1338 (2nd Cir. 1969), certiorari denied, Golten Marine Co. v. Trelleborgs Angfartygs, A/B, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 464 (1970):

It is true that a desire to find some solution for the problem stemming from Halcyon Lines v. Haenn Ship Ceiling & Refitting Corp., 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318 (1952) has led members of this court to indulge in occasional murmuring about a counterclaim by the stevedore against the ship, based presumably on the ship's breach of an implied warranty to the stevedore to supply a ship where the stevedore's employees could work in reasonable safety. . . . So long as Halcyon v. Haenn, supra, 342 U.S. 282, 72 S.Ct. 277, 96 L.Ed. 318, remains on the books, inferior federal courts will do better to abstain from further adventures in this wonderland and leave doctrinal development to the Supreme Court, unless current congressional interest in the complex problems arising from the creation of a new class of land-based seamen by the Sieracki v. Seas Shipping Co. decision 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), should result in the knot being cut in a more drastic fashion.

Accordingly, the Court must decline defendant's invitation to allocate damages in the instant case.

## II.

■ The ship was unseaworthy because a mast from which a heavy object falls during ordinary cargo unloading operations is not an appurtenance reasonably fit for its intended use. Cf.

---

5. "*Ryan* likewise disposed of the joint tortfeasor argument since it was made quite clear therein, that the right to indemnity was governed by the principles of contract and not that of tort." Norris, Maritime Personal Injuries 133 (1959).

6. Damages have in fact been allocated by a District Court in at least two cases, neither of which were appealed. Chevis v. Luckenbach Overseas Corp., 228 F. Supp. 642 (E.D.Tex.1964) ; Jones v. S.S. Jesse Lykes, 253 F.Supp. 368 (E.D. Tex.1966). See C. O. Bue, supra, at 419.

Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960); Mills v. Mitsubishi Shipping Company, 358 F.2d 609 (5th Cir. 1966), certiorari denied 386 U.S. 1036, 87 S.Ct. 1474, 18 L.Ed.2d 600 (1967).

### III.

■■ As noted in the findings of fact, there is simply no persuasive evidence in the record tending to show precisely why the collar and pin fell. As it is improper to engage in judicial guessing, the Court will not accept the stevedore's speculative theory that the ship's crew left the collar lying loose on the cross-beam. The fact that ordinary and intended use of the boom was immediately followed by the falling of the collar is sufficient to support the inference that the collar was improperly secured—an unseaworthy condition. This chain of reasoning is akin to that underlying the doctrine of *res ipsa loquitur*, which may be applicable to issues of unseaworthiness in proper cases and is fully warranted here. Scott v. S. S. Ciudad de Ibaque, 426 F.2d 1105 (5th Cir. 1970); Gibbs v. Kiesel, 382 F.2d 917 (5th Cir. 1967); Vega v. The Malula, 291 F.2d 415 (5th Cir. 1961); Petition of Sasser, 314 F.Supp. 847 (S.D.Ga. 1970). See generally Annot., Injury on Ship—Res Ipsa Loquitur, 1 A.L.R.3rd 642 (1965).

### IV.

Having concluded that the ship was unseaworthy, it remains for the Court to consider whether Atlantic & Gulf breached its warranty of workmanlike performance, thus entitling the shipowner to indemnity. The Court concludes that such is not the case.

■ The stevedore had a duty to make only a cursory examination of the vessel's equipment. D/S Ove Skou v. Hebert, supra; Vaccaro v. Alcoa Steamship Co., 405 F.2d 1133 (2nd Cir. 1968); T. Smith & Son, Inc. v. Skibs A/S Hassel, 362 F.2d 745 (5th Cir. 1966). If Atlantic & Gulf through such cursory inspection had been placed (or should have been placed) on notice that something was amiss in the rigging, then a duty would have arisen to make a more close and detailed inspection. A breach of this duty would have been a breach of the warranty of workmanlike performance. Such a case was Southern Stevedoring & Contracting Co. v. Hellenic Lines, Ltd., 388 F.2d 267 (5th Cir. 1968), where this Court cast in liability a stevedore which had allowed the use of an obviously inadequate five-ton hook to hoist an eight-ton truck, with the predictable result. In affirming, the Court of Appeals pointed out that a stevedore is under a duty to make a reasonable, if cursory, inspection of the ship's equipment. If it is apparent from this cursory inspection that the equipment may be inadequate for the intended purpose, then the stevedore should take further steps to definitely ascertain its suitability. On the instant facts, however, there was no obvious deficiency in the collar susceptible to discovery upon cursory examination because such deficiency as existed was some fifty feet above the head of a potential observer. This being the case, there arose no duty on the part of the stevedore to inquire further. Cf. Delaneuville v. Simonsen, 437 F.2d 597 (5th Cir. 1971).

■ To require a longshoremen's gang, for whom time is often of the essence, to carefully scrutinize the overhead rigging prior to turning to their task would be to establish a rule which is at war with common sense and the commercial realities of stevedoring. As much was recognized by the Fifth Circuit in Cia Maritima Del Nervion v. James J. Flanagan Shipping Corp., 308 F.2d 120 (5th Cir. 1962). There, a longshoreman was injured by falling from a ladder while descending into the hold of a ship. The accident occurred because one rung of the ladder was missing. The injured worker sued the ship, which impleaded the stevedore. It was found as a fact that the stevedore had made no inspection of the ladder or other parts of the hold where its longshoremen would be

working.[7] Despite this failure to inspect, the trial court (per Fisher, J.) exonerated the stevedore. Affirming, the Court of Appeals pointed out that indemnity against a stevedore has been allowed when a longshoreman has been injured through a defect in the ship's equipment only when the stevedore had notice of the hazardous situation and failed to remedy it. A different case is presented where, as here, the stevedore had no notice of the defect and such defect is of the sort which only a thorough prior inspection might reveal. As the Court stated:

> We are asked to establish, as part of the stevedore's standard of a safe and workmanlike performance, a rule of law that failure by a stevedore to make a thorough inspection of a ship for any "visual defects" before work by his longshoremen commences, will subject him to liability for any injuries occurring to the longshoremen because of these defects. Neither prior cases nor the practicalities of the situation point to such a result.

308 F.2d at 124.

■ Accordingly, since a cursory inspection did not reveal the problem with the collar and pin in the instant case, the failure of Atlantic & Gulf to discover it was not a breach of its warranty of workmanlike performance. It follows that indemnity against the stevedore is not available.

## V.

■ Should it develop that the Court is incorrect in holding that the stevedore did not breach its warranty of workmanlike performance, the end result of full liability upon the ship would not be changed.[8] So far as the ship is concerned, the versatility of *Ryan* is not unlimited. Even if the stevedore had breached its warranty, indemnity may be unavailable if the ship's conduct has been "sufficient to preclude recovery". Weyerhaeuser Steamship Co. v. Nacirema Operating Co., 355 U.S. 563, 657, 78 S.Ct. 438, 2 L.Ed.2d 491 (1958). Although the Supreme Court has not been quick to flesh out the bones of the so-called "Weyerhaeuser Corollary", cf. Compania Anonima Venezolano de Navegacion v. Matthews, 371 F.2d 971, 973 (5th Cir. 1967), the Court of Appeals for this Circuit has made it clear that fault on the part of the ship may be sufficiently egregious to suspend its right-over against the stevedore. In deference to the contractual theory underpinning *Ryan*, and in recognition that discussion of tort concepts such as active and passive negligence has been banished from *Ryan*-type cases, cf. *Weyerhaeuser*, supra, 355 U.S. at 569, 78 S.Ct. 438, it has been said that the only transgression by the ship sufficient to preclude indemnity is the sort of unseaworthiness which prevents or hinders the stevedore's workmanlike performance. Waterman Steamship Corp. v. David, 353 F.2d 660 (5th Cir. 1965), certiorari denied 384 U.S. 972, 86 S.Ct. 1863, 16 L.Ed.2d 683 (1966). Cf. Restatement of Contracts (First), Sections 295, 315. Consigned as we are to a contractual analysis based upon the prevention of

7. The Court of Appeals noted that: "Since the missing and bent rungs were about four feet from the coke and about eight feet in the lower hold below the 'tween deck, it is not clear from the evidence in the record that anything other than a careful inspection or an actual descent at least part way down the ladder would have disclosed the defect." 308 F.2d 25, 122. Similarly, in the instant case, it is not clear that anything short of an ascent into the rigging would have revealed the unsecured collar.

8. As noted in the discussion of allocation under Conclusion of Law I, it seemed to the Court initially that the stevedore fell somewhat short of a due standard of care in allowing the defective collar apparatus to go unnoticed. For reasons stated in the text under Conclusion of Law IV, the Court is of the view that this sort of oversight does not amount to a breach of warranty. However, since the stevedore's conduct has to some extent been impugned, it is deemed appropriate to explore, as an alternative ground, the legal consequences which would follow from regarding this conduct as a breach of warranty.

performance doctrine, see 5 Williston on Contracts § 677 (3rd ed.), instead of the more facile yet forbidden relative fault approach indigenous to tort, see Italia Societa per Azioni di Navigazione v. Oregon Stevedoring Co., 376 U.S. 315, 84 S.Ct. 748, 11 L.Ed.2d 732 (1964), it has yet been tacitly recognized that the two decisional processes often come in the end to about the same thing, e. g., a balancing test. As the Court states in Southern Stevedoring & Contracting Co. v. Hellenic Lines, Ltd., supra, 388 F.2d at 271: "the trier of fact must weigh the substantiality of the fault of the shipowner against the breach of warranty by the stevedore to determine whether the former's conduct is 'sufficient to preclude indemnity.' "

■ A useful decisional standard for the guidance of courts engaged in such balancing was suggested by the *Italia* case, supra, in which the Supreme Court observed that "liability should fall upon the party best situated to adopt preventive measures and thereby to reduce the likelihood of injury." 376 U.S. at 324, 84 S.Ct. at 754. Cf. Jackson v. Lloyd Brasileirs Patrimonio, 324 F.Supp. 556 (S.D.Tex.1970). In the instant case, since the equipment which failed was supplied by the ship and rigged by the ship in anticipation of ordinary use, it is clear that the ship was better situated than the stevedore to minimize the risk of injury from a malfunction in the rigging high above deck. Accordingly, it follows that unseaworthiness of the sort here involved is sufficient to preclude indemnity.

## VI.

■ Having concluded that the ship's counterclaim for indemnity must fail, there remains only to decide whether the stevedore and its compensation carrier are entitled to recover their compensation payments and other damages occasioned by the ship's breach of its duty of care owed to independent contractors who come aboard to transact business. This duty includes the shipowner's dual obligations to place the vessel and its equipment in reasonably safe condition, and to warn of dangerous conditions which are known or which with the exercise of ordinary care should be known. See Federal Marine Terminals Inc. v. Burnside Shipping Company, Inc., 394 U.S. 404, 416 n. 18, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969).

■ It is obvious from the evidence that the vessel ALEX did not meet the requisite standard of care. A guideline case decided upon facts strikingly similar to those of the case at bar was Fauntleroy v. Argonaut S. S. Line, 27 F.2d 50 (4th Cir. 1928). There, the plaintiff winch operator was struck by a falling piece of an iron turnbuckle which was used to fasten a boom to the mast some forty feet above deck. It was not apparent from the testimony what caused the object to fall, although it was clear that the boom had been rigged by the ship's crew. As here, the facts of the occurrence clearly warranted the inference of negligence on the part of the ship. Holding that the trial court should have applied *res ipsa* reasoning to cast the ship in liability, the Court of Appeals for the Fourth Circuit stated in language which might, save for its pre-*Sieracki* aspect, have been written for the instant case:

. . . (w)hile it is true that as to libelant, an employee of an independent contractor, the vessel was not required to do more than to exercise reasonable care to furnish him a reasonably safe place and reasonably safe appliances, and to inspect the same from time to time, circumstances taken as a whole unmistakably point to the conclusion that the fall of the turnbuckle barrel would not have occurred if these duties had been properly discharged. . . .

It was the duty of the ship to furnish loading tackle free from defects . . Neither libelant nor his employer, the stevedore, were charged with any duty in respect to this part of the ship's tackle. Each had a right to assume that it was free from any defects not observable in the exercise of ordinary care. Whatever duty there was to

fasten the turnbuckle, so that it would not fall, was imposed on the vessel.

27 F.2d at 51. So also in the case at bar, by reason of the defectively secured collar and pin overhead, the longshoremen's work area was not in a reasonably safe condition. Additionally, the warning, if given at all, came too late. For these negligent omissions the ship is chargeable, and it follows that plaintiffs are entitled to recover their damages occasioned thereby.

The foregoing constitutes the Court's findings of fact and conclusions of law. Rule 52, Fed.R.Civ.P. Any finding of fact which constitutes a conclusion of law is adopted as such. Any conclusion of law which constitutes a finding of fact is adopted as such.

Plaintiffs shall, within 10 days, submit a proposed form of judgment consistent with the foregoing, after approval as to form by opposing counsel.