Merla Mae CHEVIS et al., Plaintiffs,

v.

LUCKENBACH OVERSEAS CORPORA-TION and Maritime Overseas Corporation, Defendants and Third-Party Plaintiffs,

v.

JAMES J. FLANAGAN SHIPPING COR-PORATION, Third-Party Defendant and Fourth-Party Plaintiff,

v.

TEXAS EMPLOYERS' INSURANCE AS-SOCIATION, Intervenor and Fourth-Party Defendant.

Civ. A. No. 4621.

United States District Court
E. D. Texas,
Beaumont Division.

April 24, 1964.

George W. Brown, Jr., Beaumont, Tex., for plaintiffs.

Edward W. Watson, Eastham, Watson, Dale & Forney, Galveston, Tex., for defendants and third-party plaintiffs.

Louis V. Nelson, Strong, Pipkin, Strong & Nelson, Beaumont, Tex., for third-party defendants and fourth-party plaintiffs.

Carl O. Bue, Jr., and Ben L. Reynolds, Royston, Rayzor & Cook, Houston, Tex., for intervenor and fourth-party defendant.

FISHER, District Judge.

This is a civil action for actual and exemplary damages brought under the Texas Wrongful Death Statutes, Vernon's Ann.Tex.St. arts. 4671 et seq., and art. 16, § 26 of the Texas Constitution Vernon's Ann.St.

Austin Chevis, a longshoreman employed by James J. Flanagan Shipping Corporation, was accidentally killed at Beaumont, Texas, while working aboard the Steamship LENA LUCKENBACH. Owner of the vessel was Luckenbach Overseas Corporation and the Operator was Maritime Overseas Corporation. She was under time charter to States Marine Corporation, which in turn had chartered space in the No. 3 cargo hold to the United States. The fatal accident occurred on 27 February 1962 and during the loading of the government cargo in this hold.

A formal award of benefits under the Longshoremen's and Harborworkers' Compensation Act was first made in favor of Chevis' surviving wife and children. Within the six months period provided by 33 U.S.C.A. § 933 this suit was then brought by the wife and children against Luckenbach and Maritime Overseas Corporation, alleging unseaworthi-

ness, negligence, and gross negligence on the part of those defendants. They in turn have filed a third-party complaint against Flanagan for indemnity, alleging breach of that stevedore's warranty of workmanlike service. Flanagan in its turn has filed a fourth-party complaint against Texas Employers' Insurance Association, alleging that it had refused, as Flanagan's public liability carrier, to undertake defense of the indemnity action and should be held for the costs and expenses the stevedore would incur in that behalf. This fourth-party complaint has been assigned for separate trial, if required. Texas Employers' Insurance Association also appears as an intervenor, claiming the subrogation rights which it has, as the compensation carrier, out of any recovery by the plaintiffs in this suit.

The case was tried before the Court, without the intervention of a jury, and these Findings of Fact and Conclusions of Law are made and entered by the Court under Rule 52(a), F.R.Civ.P.

## FINDINGS OF FACT

1. Merla Mae [Darejean] Chevis, now a feme sole, suing herein in her individual and representative capacities, is the surviving wife of Austin Chevis, deceased. They were legally married 19 January 1941. This marriage is the only marriage contracted by either party. Merla Mae Chevis was born 18 September 1924. Austin Chevis was born 15 August 1923.

2. Three [and only three] children were born of the marriage of Merla Mae Darejean and Austin Chevis. Their names and dates of birth are as follows:

| Name | Date of Birth |
| --- | --- |
| Patricia Ann Chevis | 11 January 1942 |
| Delores Ann Chevis | 2 September 1945 |
| Charles Anthony Chevis | 9 April 1948 |

3. Merla Mae Chevis is the duly qualified and acting Administratrix of the Estate of Austin Chevis, Deceased, and Guardian of the Estates of Delores Ann and Charles Anthony Chevis, Minors. Merla Mae Chevis qualified as Guardian of the Estate of Patricia Ann Chevis on 4 May 1962. This guardianship is now closed. At the time of his death Austin Chevis was living with and was the sole support of his wife and children. He had no other dependents, either at the time of his death or for a number of years prior thereto.

4. The SS LENA LUCKENBACH is a C-3 type dry cargo steel screw steamer of approximately 7,938 gross and 4,640 net tons, Official No. 244049, home port, New York, New York. All the officers and crew of said vessel were in the employ of one or both of said Defendants. At no material time was the SS LENA LUCKENBACH under a demise charter.

5. The fatal accident occurred on the second deck of the SS LENA LUCKENBACH, referred to both as the "shelter deck" and the "upper 'tween deck", and at the no. 3 hatch. The description of the hatch opening and covering concerned as set out in the report of a surveyor, and undisputed [except insofar as it failed to mention the sockets for a missing "queen" beam discussed hereafter], was in these terms:

"The No. 3 Upper Tween Deck Hatch is 23' 6" wide x 37' 6" long. The hatch is fitted with six removable transverse beams which seat in beam sockets at the port and starboard coamings. Three of these beams are designated 'king beams' and are fitted with a 2½" vertical division bar at the center of the flange which serves as a division between hatch board sections. Three of the beams are designated 'queen

beams' with no division bar at the landing flange.

"The hatch beams are spaced for to aft as follows:

No. 1 Beam, a 'king beam', spaced 6' 5" from the forward coaming.

No. 2 Beam, a 'queen beam', spaced 5' 3" from the No. 1 beam.

No. 3 Beam, a 'king beam', spaced 5' 3" from the No. 2 beam.

No. 4 Beam, a 'queen beam', spaced 5' 3" from the No. 3 beam.

No. 5 Beam, a 'king beam', spaced 5' 3" from the No. 4 beam.

No. 6 Beam, a 'queen beam', spaced 5' 3" from the No. 5 beam and 5' 3" from the after coaming.

"The area of the hatch between the forward coaming and the No. 1 Beam is covered with sixteen 2½" thick x 18" wide x 6' 4" long timber hatch boards, installed fore to aft. The landing flange on which the hatch boards rest at the forward coaming is 3½" wide. The landing at each side of the division bar on the 'king beam' flange is 3¼" wide.

"The area of the hatch between the No. 1 Beam and the No. 3 Beam, a span of 10' 6" is covered by sixteen 2½" x 18" x 10' 6" timber hatch boards, installed fore to aft.

"The areas of the hatch between the No. 3 Beam and the after coaming (the after half of the hatch square) is covered by four removable steel plates 10' 6" long x 11' 9" wide, bolted over 2½" timber hatch boards.

"Beam and coaming landing flanges are 2¾" below the upper edge of the coaming which permits the hatch boards to fit flush with the edge of the hatch coaming.

"The Tween Deck hatch coaming is raised 9" above the level of the deck plating; the hatch is bounded at all sides by a brow of steel checker plate 9" high at the coaming and sloping away over a length of 30" to the deck. The angle of the brow plate to the deck is measured to be approximately 17°. The brow plate is separated from the coaming of the hatch at the upper edge by a space 5" wide.

"The No. 3 Weather Deck, Upper and Lower Tween Deck Hatches are identical in length and width and are in vertical alignment.

"The vertical distance between the top of the Upper Tween Deck brow plate and the lower flange of the Weather Deck Hatch Coaming is 7' 7". The height of the Upper Tween Deck space is 11' 4" measured from beam to beam."

The 5" wide batten well, or gully, that ran completely around the hatch was not covered at any material time.

6. Each of the hatch covers referred to by the surveyor as being 18" wide was made up of two planks, each approximately 9" wide, fastened together by means of either two or three steel rods or drift bolts approximately 9/16" in diameter running through the full width of the cover. A handhold was provided at either end of each cover by a cut 4–5" in diameter made to a depth of approximately 1¾" at a distance of about 10" from the end of the cover. These handholds either were cut in the way of the drift bolts, or a steel pin was inserted across them. The material of the covers broken or damaged in the accident and brought to the Court as exhibits was identified as being No. 2 Douglas Fir.

7. In addition to the transverse beams across this hatch opening as enumerated and described by the surveyor, all of which were in place at the time of the accident, standard sockets for another "queen" beam were welded in place on each side of the hatch midway between the forward hatch coaming and the no. 1 "king" beam. The "queen" beam which was built for, intended to be, and had theretofore been inserted in these sockets, was permanently removed from the vessel by her owners in 1960, when the vessel was put in the intercoastal trade, to expedite and facilitate opening the forward end of the hatchway.

If the missing "queen" beam had been in place at the time of the accident it would have provided a center support under the forward tier of hatch cover boards, which were 6' 4" long and were the covers directly involved in the accident. This "queen" beam had not been used since it was removed from the vessel and was not aboard on this occasion. It had not been replaced at the time the Chief Mate's deposition was taken in May 1963, and the hatch boards in use aboard the vessel at that time were the same thickness as the boards that broke in this accident.

8. Chevis was a fork lift machine operator in one of two gangs of longshoremen employed by Flanagan to work the no. 3 hatch of the SS LENA LUCKENBACH. The gangs reported for work at 1900 hours CST on 26 February 1962. They worked under the immediate direction and supervision of Perry Berwick, a Walking Foreman, and Leon Irwin Jordan, the stevedore Superintendent, both of whom were regular, full-time employees of Flanagan.

The first work that the longshoremen performed was to remove the covers and beams over the hatch opening at the no. 3 upper 'tween deck, and the beams over the hatch opening in the lower 'tween deck, so that cargo could be stowed in the lower hold. At about 2300 hours CST the stowage of cargo in the lower hold was completed. The longshoremen then replaced the beams at the lower 'tween deck, and the beams and covers at the upper 'tween deck. The full complement of hatch beams for the lower 'tween deck hatchway was available and the beams were inserted in their sockets, but this hatchway was not covered up. Seeing that sockets were provided for a "queen" beam between the forward coaming and the first "king" beam at the upper 'tween deck, and finding no beam for this space, after personally searching for it, Jordan inquired of a ship's officer where where he might find the missing "queen" beam. He was told that it was not aboard the vessel. Jordan then directed the longshoremen to cover up the upper 'tween deck hatch opening without a "queen" beam in place beneath the forward tier of boards. During all this time Chevis had remained on the dock. He came aboard the vessel for the first time after the upper 'tween deck hatchway was covered up by the longshoremen.

9. The stevedore then brought two gasoline-engine-driven fork lift machines into the upper 'tween deck in order to stow heavy palletized cargo in that hold. The machines were brought aboard the vessel from the dock by means of the ship's hoisting gear and landed on the hatch boards. Next the bridle [furnished by the stevedore] was unhooked. Drivers then mounted the machines and drove them off the hatch boards into the wings.

The machine Chevis operated throughout the night and was driving at the time of his fatal accident weighed 6,180 pounds unloaded. It was capable of carrying a load of 4,000 pounds on the front forks. In unloaded condition approximately 4,280 pounds of the machine's weight was carried by the rear wheels, because of the heavy counterweight at that end, and approximately 1,860 pounds were carried by the front wheels, which were the drive and steering wheels. The wheelbase of this machine was 47". The tread [across axle to tire center] was 32". The outside diameters of the front and rear wheels were 17 and 15", respectively. The tires were of solid rubber, with a 5–6" tread. Chevis weighed about 210 pounds.

The palletized cargo that was being stowed in this hold consisted of crated steel idler wheels for Army tanks. Each crate weighed 1,460 pounds. The crates were brought aboard the vessel two at a time and landed on the hatch cover. The fork lift machine drivers then picked up the pallets on the forks of the machines and stowed them in the wings of the ship.

10. Flanagan had available on the dock large plates of quarter-inch steel measuring approximately 6' x 6' that it

sometimes used as protective covers over wood hatch boards when fork lift machines were to be brought aboard and operated in the holds of ships. The stevedore did not bring any of these cover plates on board the SS LENA LUCKENBACH on this occasion.

Leonard S. Martinsen, the vessel's Chief Mate, testified that either steel cover plates or thick plywood "walking boards" were used aboard the SS LENA LUCKENBACH by stevedores in other ports on top of the wood hatch boards when fork lift machines were to be brought aboard and operated.

11. The loading of the palletized cargo continued until about 0430 hours CST on 27 February 1962. By that time cargo had been stowed on each side of the hatch as far forward as the no. 1 "king" beam and within 3' of the hatch coaming. Only that portion of the hold that was forward of the no. 1 "king" beam remained clear of cargo. It was in this space that the fork lift machines were last operated. Chevis operated the machine that was working on the port side of the vessel. The machine on the starboard side was operated alternately by Berwick, the Walking Foreman, and Vallery, a longshoreman.

12. When the stowage was almost finished, Berwick left the hold to attend to the rigging of the stevedore's special 4-leg bridle that it used to remove the fork lift machines from the hold. Having stowed his last load, Vallery backed his machine up the brow plate on the starboard side of the hatch all the way onto the most forward tier of hatch boards, so that all four wheels of the machine were resting on the boards. He testified that he heard the boards crack under the weight of his machine and that he immediately got off and went down the brow plate onto the deck.

During this interval Chevis picked up and stowed his last pallets of cargo. Jordan and Marvin Maddox, the time charterer's representative, both were standing on the hatch covers immediately aft of the most forward tier of boards, facing aft, and talking to each other. Jordan testified that he turned toward the port side of the ship and complimented Chevis on the good work he had done, and that Chevis smiled and said "Thank you, Mr. Irwin". Jordan then turned back facing aft and continued his conversation with Maddox. Shortly thereafter, Jordan's attention was attracted by the noise of the accident. By the time he could turn around Chevis and the machine had disappeared.

The machine fell on top of Chevis, crushing him against the most forward hatch beam [a "queen" beam] in the lower 'tween deck hatchway. This beam, according to the report of the surveyor mentioned in a preceding finding, was heavily distorted approximately 40″ inboard of the port coaming as a result of the accident.

The stevedore obtained slings and lifted the machine as soon as possible, whereupon Chevis fell downward an additional distance of approximately 6' into the lower hold.

The accident occurred at approximately 0445 hours CST. A basket was lowered into the hold, by means of which Chevis was removed from the vessel and in which he was transported a few blocks by ambulance to Hotel Dieu [hospital] in Beaumont, where he was pronounced dead on arrival at 0512 hours CST.

13. There were no eyewitnesses of the accident.

14. If the missing "queen" beam had been in place at the time of the accident it is less likely that the hatch cover boards would have broken, and in any event there would not have been room for the fork lift machine to fall downward through the hatch onto the "queen" beam in the lower 'tween deck hatchway. A comparable strengthening and protection of the wood hatch covers could have been achieved by the use of steel cover plates or plywood "walking boards".

15. Because of the manner in which the cargo had been stowed in the upper 'tween deck, the two fork lift machines could only be unloaded from the forward

end of the hatch where the accident occurred.

16. No one connected with the vessel or the stevedore warned Chevis of the dangerous condition of the forward tier of hatch boards, or told him the "queen" beam was missing, or ordered him not to drive his machine either wholly or partly onto the hatch boards, or directed him to follow a different method of positioning his machine for unloading it from the vessel.

17. Jordan testified that Chevis had worked as a fork lift machine operator under his supervision since 1954, and that Chevis was as good a driver as there was on the waterfront. Jordan also testified that he was familiar with the procedure that Chevis customarily followed on vessels with a brow plate around the hatch in getting his machine in position to be unloaded from the vessel, and that his customary procedure was to back the machine up the brow plate and stop with the back wheels on the hatch boards a distance of approximately 1' out from the coaming, leaving the front wheels back under the coaming to a certain extent. Jordan also testified that this procedure was the one generally followed at the Port of Beaumont.

18. In order for Chevis to get the rear wheels of his machine onto the hatch boards on this occasion it was necessary for him to drive them across the uncovered 5" wide batten well, or gully, that surrounded the hatch.

19. None of the ship's officers were in the hold at the time of the accident. The Master [Winterling] was asleep in his bunk; the Chief Mate [Martinsen] was leaning on the rail drinking his morning coffee; the Second Mate [Mellis] was on the dock checking the ship's draft preparatory to sailing; the Night Mate [Fay] had been relieved when Mellis came on watch at 0400 hours CST. All of the ship's officers above mentioned knew that the missing "queen" beam was not aboard. Martinsen and Mellis, both of whom testified by deposition, knew that fork lift machines were being operated in the hold.

20. Five hatch covers [each made up of two planks], all to port of the center line of the vessel, beginning with the second cover from the port side of the hatch, either were completely broken or badly damaged when the machine driven by Chevis crashed through. At least one board gave way at the cut for a handhold. Another broke approximately in the center of its longest dimension, where a drift bolt and several large knots were present. A third broke about 2' from one end where several large knots were present. The presence in the broken covers of many large knots, the drift bolts and the holes drilled through the boards to receive them, and the cuts for the handholds, materially weakened the strength of the covers and lessened their ability to support weight and resist impact.

21. The boards were not made of wood which was of satisfactory quality, straight grained, and reasonably free from knots, sap and shakes, as the *Rules for the Classification and Construction of Steel Vessels*, promulgated by the American Bureau of Shipping, required. Furthermore, said Rules were not complied with in that the spacing of the hatch beams exceeded the dimension permissible along the lengthwise direction, unless the thickness of the covers was suitably increased, which these were not.

22. Austin Chevis did not know that a "queen" beam was not in place under the forward tier of hatch boards, or that the hatch boards were knotty and otherwise deficient and defective. He was on the dock at all times while the hatch was being uncovered, while it was open, and while it was being re-covered. Although the knots and other defects in the boards were patent to anyone making a close visual examination of the boards, they would not have attracted the attention of a casual observer in the hold on the night in question.

23. Expert testimony showed that the maximum safe load to which hatch covers, made up as these were, of similar material and dimensions, without intermediate support, should be subjected, is

2,020 pounds, or substantially less than the dead weight carried by the rear wheels of the fork lift machine Chevis was operating, and that this overloading would increase with any impact of the machine on the boards. Expert testimony further showed that such covers, had they been supported at midspan by a "queen" beam, could have been safely subjected to a maximum load of 4,930 pounds.

24. When the Chief Mate examined the boards on the forward end of the hatch some nine days before the fatal accident he saw the same knots, in the same general position, that he observed on examining the broken boards immediately after the accident. He testified that he did not then believe that these knots rendered the boards defective.

25. The stevedore did not comply with the Longshoremen's and Harbor Workers' Compensation Act and the Safety and Health Regulations for Longshoring, promulgated pursuant thereto by the Office of the Secretary of Labor [29 C.F.R. 9.1 ff.], in that (a) mechanically-powered vehicles were being used in the hold and on the hatch, and the stevedore did not protect the life and safety of its employees and render safe their employment and places of employment by making adequate provisions to insure that the working surface of the hatch where the fatal accident occurred could support the Chevis fork lift machine and its driver, and that the hatch covers could not be dislodged by movement of the vehicle; and (b) cargo was landed on and handled over a covered hatch or 'tween deck and all beams were not in place under the hatch covers.

26. The missing "queen" beam had not been replaced at the time the Chief Mate's deposition was taken in May 1963, and the hatch boards in use aboard the vessel at that time were of the same thickness as the boards that broke in this accident.

27. Chevis was an intelligent, experienced, careful, highly competent fork lift machine operator. He was first employed as a longshoreman in 1949, and continued working as such from that year until his death. He was industrious, energetic, co-operative, respectful, and of good moral character. He was well-liked and respected by his bosses, fellow workers, and the local Business Agent of the International Longshoremen's Association, the Union of which he was a long-time member. He was a conservative man, of industrious and thrifty habits. Most of his earnings were spent to maintain and support his wife and children. He performed more than the ordinary services about the home. His parental influence was a strong force for good in the nurture, care, and moral and mental training of his children. He was close to his children and devoted much of his time to their instruction and guidance, which is reflected in their school records and general reputations.

28. Chevis was in good health immediately prior to his death. He was healthier and had more than the ordinary vigor of a man of his age. If he had not met death in this accident he could have been expected to live out more than his normal life expectancy of approximately 33 years. His wife's normal life expectancy was somewhat greater.

29. Neither the International Longshoremen's Association nor any of the stevedoring companies that rendered services at the Port of Beaumont had compulsory retirement regulations in force. A number of longshoremen who are over 65 years of age are working at the Port of Beaumont. One longshoreman over 80 years of age retired recently. Chevis' Union has a pension plan, first put in force a few years ago, under which benefits of $100. per month [increased from $50. at inception of the plan] are payable to members with 25 or more years of employment as longshoremen.

30. During the calendar year 1961, the last full year of his life, Austin Chevis was paid aggregate wages of $6,598.36 for his work as a longshoreman. Only a small portion of his income was used to defray his personal living expenses. His

prospects for increased earnings were good. Hourly wage rates for longshoremen working at the Port of Beaumont increased an average of 3% per annum, in practically a straight line, during the period 1955–1963. The average annual increase during the period 1946–1963 was 4.1%. Increases in the cost of living, or alternatively, decreases in the purchasing power of money, during the same period have held within this range of hourly wage rate increases.

The total tonnage [exclusive of petroleum] handled at the Port of Beaumont in 1962 [880,247 tons] was 57.4% greater than it was in 1958 [559,176 tons]. This amounts to an average annual rate of growth of approximately 12% during the years 1958–1962 and demonstrates a steady increase in the amount of work available for longshoremen at the Port of Beaumont.

31. Merla Mae Chevis paid $526. of her husband's funeral expenses, and $50. for a headstone to mark his grave. These expenses were reasonable and not unsuited to his condition of life.

32. As the direct and proximate result of the death of Austin Chevis his surviving wife, Merla Mae Chevis, has lost the value of his attention, care and counsel, the value of the contributions from his earnings he would have made for her maintenance and support, the value of the services that he performed about their home before his death, including the assistance he gave her in caring for their children, and the value of the legacy she would have received from him but for his untimely and wrongful death; and his surviving children have lost the sums of money that he would have contributed to their maintenance and support, and the sums of money representing their loss of parental nurture, care and moral and mental training, all of which they would have received but for his untimely and wrongful death.

33. Under the terms of a Compensation Order entered in Case No. 3411–333 [Fatal] by C. D. Calbeck, Deputy Commissioner, Eighth Compensation District, on 11 May 1962, the following award of death benefits was made:

"*AWARD*

"The employer, the James J. Flanagan Shipping Corporation, and the insurance carrier, the Texas Employers' Insurance Association, shall pay forthwith death benefits as follows: To Mrs. Merla Mae Chevis, surviving wife of the employee, in her own behalf, at $36.75 per week, and to her in behalf of the two surviving minor children, Delores Ann Chevis and Charles Anthony Chevis, at $31.50 per week, or a total of $68.25 per week, for death benefits that have accrued from February 27, 1962, to May 7, 1962, inclusive, 10 weeks, in the sum of $682.50. Subsequent to May 7, 1962, they shall continue to pay Mrs. Merla Mae Chevis biweekly installments of death benefits at the combined rate of $68.25 per week, in her own behalf and in behalf of the said minor children, subject to the limitations of the Act or until further Order of the Deputy Commissioner."

Pursuant to said Award, death benefits have been paid since 27 February 1962 by Texas Employers' Insurance Association.

\* \* \*

## CONCLUSIONS OF LAW

1. This Court has jurisdiction. Venue is in this District and Division. All necessary parties plaintiff and defendant are properly before the Court.

2. At all material times the SS LENA LUCKENBACH was unseaworthy, and Defendants failed to provide Austin Chevis with a reasonably safe place to work, in that (a) the vessel was not equipped with a "queen" beam for use as an intermediate transverse support beneath the forward tier of wood hatch covers in the upper 'tween deck hatchway of no. 3 cargo hold; (b) the forward tier of wood hatch covers was not supported by a "queen" beam; (c) all

beams were not in place under the hatch covers; (d) the spacing of the hatch beams at the forward end of the hatch along the lengthwise direction of the covers was excessive; (e) the forward tier of hatch covers was deficient and defective; (f) steel cover plates were not used over the forward tier of wood hatch covers; and (g) the batten well around the hatch was left uncovered.

3. Such unseaworthiness and failure to provide Austin Chevis with a reasonably safe place to work was a proximate cause of the death of Austin Chevis.

4. Defendants Luckenbach Overseas Corporation and Maritime Overseas Corporation were grossly negligent (a) in removing the "queen" beam with which the SS LENA LUCKENBACH originally was equipped from the vessel; (b) in not providing a "queen" beam to support the forward tier of wood hatch covers; and (c) in equipping the vessel with deficient and defective wood hatch covers on the forward end of the hatch.

5. Such wilful acts or omissions, or gross negligence of Defendants, were the result of a conscious indifference on their part toward the safety and welfare of Austin Chevis.

6. Such gross negligence of Defendants was a proximate cause of the death of Austin Chevis.

7. The unseaworthiness of the SS LENA LUCKENBACH, and the wrongful acts, negligence, carelessness, unskillfulness or defaults of Defendants, were of such character as would, if the death of Austin Chevis had not ensued, have entitled him to maintain an action for his injuries.

8. James J. Flanagan Shipping Corporation, Third-Party Defendant, was negligent (a) in covering up the hatchway of no. 3 cargo hold without a "queen" beam in place to support the forward tier of hatch covers at midspan; (b) in failing to have all beams in place under the hatch covers; (c) in failing to use the steel cover plates it had available to cover up the forward tier of hatch boards; (d) in failing to cover up the batten well around the hatch; (e) in failing to properly direct and supervise the removal of Chevis' fork lift machine from the hatch; (f) in failing to warn Chevis that the forward tier of hatch covers was not supported by a "queen" beam; and (g) in otherwise failing to comply with those portions of the Safety and Health Regulations for Longshoring [29 C.F.R. 9.1 ff.] that are specifically intended to prevent this type of accident.

9. Such negligence of Third-Party Defendant was a breach of its warranty as a stevedore to perform its contract in a workmanlike manner, and was a proximate cause of the death of Austin Chevis.

10. Austin Chevis was contributorily negligent (a) in the manner in which he drove the fork lift truck upon the hatch boards; and (b) in not keeping two wheels remaining on the ramp; such negligence being found to be twenty (20%) per cent.

11. The present monetary value of the benefits that Plaintiffs had a reasonable expectation of receiving from Austin Chevis, had he lived, is the sum of ONE HUNDRED SIXTY THOUSAND and no/100 ($160,000.00) DOLLARS. Diminished by twenty (20%) per cent for contributory negligence, this amount becomes ONE HUNDRED TWENTY-EIGHT THOUSAND and no/100 ($128,-000.00) DOLLARS, which is the amount awarded Plaintiffs as actual damages.

12. Plaintiffs are entitled to twenty-five (25%) per cent of ONE HUNDRED SIXTY THOUSAND and no/100 ($160,000.00) DOLLARS as exemplary damages on account of the gross negligence of Defendants. This is the sum of FORTY THOUSAND and no/100 ($40,000.00) DOLLARS. Diminished by twenty (20%) per cent for contributory negligence, this sum becomes THIRTY-TWO THOUSAND and no/100 ($32,-000.00) DOLLARS, which is the amount awarded Plaintiffs as exemplary damages.

13. Plaintiffs are entitled to have judgment against Defendants for the aforesaid amounts of $128,000.00 actual and $32,000.00 exemplary damages under the provisions of the Texas Wrongful Death Statutes, V.A.T.S. arts. 4671 et seq., and art. 16, § 26 of the Texas Constitution.

Said amounts of actual and exemplary damages are divided among Plaintiffs, the persons entitled to the benefit of the action, as follows:

| Name | Actual Damages | Exemplary Damages |
|---|---|---|
| Merla Mae Chevis, Individually and as Administratrix of the Estate of Austin Chevis, Deceased | $116,000.00 | $29,000.00 |
| Patricia Ann Chevis | 2,000.00 | 500.00 |
| Merla Mae Chevis, Guardian of the Estate of Delores Ann Chevis, a Minor | 4,000.00 | 1,000.00 |
| Merla Mae Chevis, Guardian of the Estate of Charles Anthony Chevis, a Minor | 6,000.00 | 1,500.00 |

14. The question of indemnity gives the Court much concern. While the Court might deny indemnity on the basis of the gross negligence of Defendants, in view of the conclusions of law contained in paragraphs 8 and 9, above, and in order to achieve what the Court considers to be a fair and equitable result as between Defendants, on the one hand, and Third-Party Defendant, on the other, the Court concludes that Defendants are precluded from obtaining full indemnity from Third-Party Defendant because of their own gross negligence, but that the actual and exemplary damages should be equally divided, and the Court is awarding fifty (50%) per cent indemnity to defendants Luckenbach Overseas Corporation and Maritime Overseas Corporation against third-party defendant James J. Flanagan Shipping Corporation, being the sum of EIGHTY THOUSAND and no/100 ($80,000.00) DOLLARS.

15. Texas Employers' Insurance Association as Intervenor is awarded judgment against Plaintiffs, severally, for the amount of benefits it has actually paid to each Plaintiff pursuant to the Award of Compensation entered by the Deputy Commissioner on 11 May 1962.

16. All amounts awarded except those mentioned in paragraph 15, above, shall bear interest at the rate of six (6%) per cent per annum from 10 October 1963 until paid in full.

17. No attorneys' fees are allowed to any of the parties.

18. The allowable costs of this proceeding are taxed one-half against Defendants and one-half against Third-Party Defendant.

19. The issues presented by the claims set forth in James J. Flanagan Shipping Corporation's Fourth-Party Complaint against Texas Employers' Insurance Association are expressly reserved for decision after a separate trial thereof to be held at a later date.

Let counsel for Plaintiffs submit an appropriate form of Final Judgment.